# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

**DANIELLE L. KRAMER O'MARA,**

     **Plaintiff,**

v.
                                **Civil Action No. 2:16cv489**

**VIRGINIA DEPARTMENT**
**OF CORRECTIONS,**

     **Defendant**

## REPORT AND RECOMMENDATION

Before the Court is Defendant Virginia Department of Corrections' ("VDOC") Motion for Summary Judgment and an accompanying memorandum, filed on February 23, 2017, ECF Nos. 33-34. On March 9, 2017, Plaintiff Danielle L. Kramer O'Mara timely filed a memorandum in opposition, ECF No. 36, and VDOC timely replied on March 15, 2017, ECF No. 37. VDOC requested a hearing pursuant to Local Rule 7(E). ECF No. 35. Also before the Court is Plaintiff's Motion to Strike Motion for Summary Judgment, or for other relief as appropriate, and an accompanying memorandum, filed on March 30, 2017, ECF Nos. 40-41. VDOC timely responded on April 5, 2017, ECF No. 42, and Plaintiff replied on April 11, 2017, ECF No. 45. These matters were referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to two Referral Orders from the Chief United States District Judge. ECF Nos. 38 and 44; *see also* 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72. A hearing took place on both motions on April 21, 2017, at which appeared Steven Wiley on behalf of Plaintiff and Assistant Attorney General Sidney Rab on behalf of VDOC. ECF No. 47. The motions are now ripe and ready for recommended disposition.

Plaintiff, a former Probation and Parole Officer employed by the Department of Corrections in Suffolk, Virginia, alleges four counts in her complaint against Defendant Virginia Department of Corrections: quid pro quo sexual harassment in violation of Title VII, 42 U.S.C. § 2000e, et seq., (Count I); retaliation in violation of Title VII, 42 U.S.C. §2000e, et seq. (Count II); gender discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq. (Count III); and wrongful discharge in violation of Virginia Public Policy (Count IV). ECF No. 1. In short, Plaintiff claims she was subjected to quid pro quo sexual harassment and terminated from her employment when she rejected her supervisor's sexual advances. Defendant claims that Plaintiff's probationary term of employment was justifiably terminated because she violated numerous Department of Corrections policy and procedures, and therefore no material facts would support a finding for Plaintiff on her four counts. However, because there are material facts in dispute, for the foregoing reasons the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment, ECF No. 33, be **DENIED**. In addition, the undersigned **RECOMMENDS** that Plaintiff's Motion to Strike the Motion for Summary Judgment, ECF No. 40, be **DENIED**.

## I. STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, finds there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). A court should grant summary judgment if the nonmoving party, after adequate time for discovery, has failed to establish the existence of an essential element of that party's case, on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To

defeat a motion for summary judgment, the nonmoving party must go beyond the facts alleged in the pleadings and instead rely upon affidavits, depositions, or other evidence to show a genuine issue for trial. *See id.* at 324. Conclusory statements, without specific evidentiary support, are insufficient. *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998). Rather, "there must be evidence on which the jury could reasonably find for the [party]." *Anderson*, 477 U.S. at 252. Ultimately, cases are not to be resolved on summary judgment where "the depositions [and affidavits] of principal witnesses present conflicting versions of the facts which require credibility determinations." *Nilson v. Historic Inns Group, Ltd.*, 903 F. Supp. 905, 909 (D. Md. 1995) (citing *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986)).

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Defendant's Motion for Summary Judgment

Danielle L. Kramer O'Mara was hired on January 25, 2016, to serve a "12-month probationary period" as a Probation and Parole Officer ("PPO") at Suffolk Adult Probation. ECF No. 34, attach. 3. PPOs visit probationers' homes and determine "[w]hether they're complying with their court order, whether there's community safety issues, and whether there's officer safety issues" based upon whether the probationers are under the influence of drugs, possessing weapons, or associating with gang members. *Id.*, attach. 15 at 4-5. Chief Grant Knight ("Chief Knight") and Deputy Chief Shaleta Norfleet ("Deputy Chief Norfleet") were among those responsible for supervising the probation officers, and on March 1, 2016, Deputy Chief Norfleet became O'Mara's direct supervisor. *Id.*, attach. 16 at 6.

The parties have proffered declarations, deposition transcripts and interrogatory answers to support their interpretations of various incidents that occurred during the tenure of Plaintiff's

3

probationary employment. Reviewing the record as a whole in the light most favorable to Plaintiff, the nonmoving party, as this Court is required to do, discloses the following material facts. Prior to Plaintiff's termination, Chief Knight made several inappropriate comments to Plaintiff regarding her appearance, telling her she had "a nice figure," was "a very pretty woman," and that she must "work very hard on her figure." ECF No. 36, attach. 9 at 6-7. In addition, he told her he was distracted by how good she looked in her pants, and described himself to her as "a leg man." *Id.* at 8. On one occasion he touched her inappropriately by placing his hand on her lower back and buttocks for a couple of seconds while helping her into his car. *Id.* at 5-6. On another occasion, O'Mara told Knight that she "had been gone from the office for doctor's appointments" and "felt that [she] needed to share with him that [she] had [Crohn's disease] because [she] had been hospitalized for it before." *Id.* at 8-9. O'Mara said Knight told her his wife had Crohn's disease "very badly and she's on disability for it and at times it keeps her from meeting certain needs or wifely duties." *Id.* at 9. Knight asked O'Mara if she ever had problems "meeting [her] husband's needs or wifely duties" and she replied that she had a mild form of the disease and that "it doesn't affect [her] in that way." *Id.*

With this background, several significant events occurred during the last two weeks of Plaintiff's employment which culminated in the termination of Plaintiff's probationary period of employment. Defendant contends that these incidents culminated in a joint decision by Human Resources Officer Angelica Jones, Deputy Chief Norfleet and Chief Knight to end Plaintiff's employment. Plaintiff contends these incidents are either untrue, exaggerated, or distorted, and instead were merely pretext for Chief Knight's decision to terminate Plaintiff's employment because she would not submit to his sexual advances.

On February 29, 2016, O'Mara "after having met with offender Saquan Stroud, contacted former District #6 employee Richie Soriano due to what she believed were discrepancies in what was being reported [by Stroud] during an office visit." ECF No. 34, attach. 5 at 1. Soriano had previously been Stroud's PPO, *Id.*, attach. 15 at 13, and he recommended that O'Mara schedule a meeting regarding the matter with members of the Suffolk Police Department for March 2, 2016, *Id.*, attach. 5 at 1. Field Training Officer Charlotte Baker ("FTO Baker"), Deputy Chief Doris Franklin ("Deputy Chief Franklin"), Chief Knight and Deputy Chief Norfleet were not advised of the meeting beforehand. *Id.* VDOC contended that O'Mara "was supposed to consult only her Field Training Officer Charlotte Baker, one of the Deputy Chiefs, Norfleet or Franklin, or Grant Knight regarding her case management concerns pending completion of O'Mara's Basic Skills Training." ECF No. 34 at 4. Soriano had been demoted several years earlier for being involved in a sexual relationship with another PPO, and for allowing "the same probationer to break several of the Department of Corrections' and district's policy." *Id.*, attach. 16 at 3-4. VDOC claimed reaching out to Soriano and unilaterally scheduling a meeting with Suffolk Police violated VDOC protocol and constituted misconduct.

VDOC contended that FTO Baker reported two other incidents of O'Mara's misconduct to Chief Deputy Norfleet, both of which O'Mara disputes. ECF No. 34 at 3; ECF No. 36 at 4. First, Norfleet averred that Chief Knight and O'Mara met after O'Mara "felt that [Knight] spoke to her out of—out of turn and said something to her in front of an offender and it offended her." ECF No. 34, attach. 16 at 8. Although Norfleet acknowledged she was not there, she said she heard O'Mara's "response wasn't appropriate" and that "she was yelling and screaming and slamming things down in her office." *Id.* O'Mara argued that this assertion is hearsay and should not be considered by the Court. ECF No. 36 at 4. Second, Chief Knight said he heard

O'Mara tell PPO James Lowe "she was very frustrated over something she was trying to understand from Lowe [and] she screamed out, I am going to go kill you if you don't do this." ECF No. 34, attach. 17 at 3-4. Chief Knight stated in his deposition that he believed the statement was not an actual death threat, but "rhetorical hyperbole." *Id.* at 4. O'Mara also said that her statement was not a threat, but rhetorical hyperbole, and that it constitutes hearsay which should not be considered. ECF No. 36 at 4.

Next, Deputy Chief Norfleet testified that on a separate occasion she saw O'Mara in PPO Lowe's office "sitting on his desk facing him with her legs crossed" and Norfleet later told O'Mara in an "informal conversation" that "the way she was sitting on [Lowe's] desk was a bit too familiar for the office setting" as they are both married and it "can be inferred in any number of ways." ECF No. 34, attach. 16 at 11.

On March 9, 2016, O'Mara went to the home of Probationer Saquan Stroud with Surveillance Officer Rosalie Yarborough. *Id.*, attach. 1 at 1. Norfleet specifically approved Plaintiff going to the probationer's home with Yarborough. *Id.*, attach. 16 at 25-26. O'Mara and Yarborough did not discuss the rules concerning entry into a probationer's bedroom. *Id.* at 2. When they arrived, Stroud was "sitting on the front steps smoking and talking to a girl that was sitting in a car in the driveway." *Id.*, attach. 15 at 10. Stroud told O'Mara and Yarborough "[l]et's go inside because she's crazy and I don't want her to come back." *Id.* at 11. O'Mara entered Stroud's home and then his bedroom where he told her that his girlfriend made a "huge hole" in his bedroom wall. *Id.* at 13. Yarborough testified in her deposition that O'Mara stepped into Stroud's bedroom, but never went through his drawers or closet or acted inappropriately. ECF No. 36, attach. 7 at 3-4.

6

On March 10, 2016, Deputy Chief Norfleet and FTO Baker met with O'Mara regarding the home visit. ECF No. 34, attach. 2 at 4; *Id.*, attach. 15 at 15. O'Mara said that Norfleet repeatedly asked her why she thought she could go through Stroud's home. *Id.* O'Mara stated that this was the first time she went to a probationer's home without a fully trained Probation Officer and that she had not undergone training on home visits. *Id.* at 18. O'Mara told Norfleet that "other officers had done so, and [she] had done so in Nebraska" where she was previously employed as a probation officer. *Id.*, attach. 2 at 4. O'Mara also stated that the last two officers who held her position, Kelvin Hoggard and Richie Soriano, went into offenders' homes. *Id.* O'Mara stated Norfleet told her she was a "small female whereas Mr. Soriano and Mr. Hoggard were large, intimidating males." *Id.* Contrary to Yarborough's testimony, Norfleet accused O'Mara of improperly going through Stroud's bedroom closet and dresser. *Id.*, attach. 16 at 25-26. O'Mara said she met with Chief Knight about the home visit that day or the next day and explained why she believed she could enter Stroud's home. *Id.*, attach. 2 at 4. O'Mara stated that Knight told her "that although the two prior officers had done so, [she] was a 'small attractive female' and [she] was 'more at risk for safety concerns.'" *Id.* at 5.

On March 10, 2016, Stroud reported to the Suffolk District office to inform O'Mara he received misdemeanor charges while at a party where drugs were present. *Id.* O'Mara tried to get Stroud to take a drug test and "[h]e immediately got upset, said 'this is bullshit', and began arguing with [her] to not drug test him." *Id.* O'Mara stated Stroud threatened her, after which she called a male officer, Gregory Lamont Boone, to take a urine sample from him. *Id.* "While he was being drug tested, [O'Mara] immediately located Ms. Norfleet and informed her of the threat." *Id.* O'Mara told Norfleet she told Stroud to "get his shit together and maybe the violation process would not be as bad for him." *Id.* Norfleet asked her if she used that exact

phrasing and she said "no, [she] never cursed while he was in [her] office nor had [she] ever cursed at an offender, [she] was just trying to summarize the conversation quickly." *Id.* Boone testified in his deposition that when he came to O'Mara's office to drug test Stroud, O'Mara "was conversing with [Stroud] about his behavior" and he did not recall O'Mara using profanity. ECF No. 36, attach. 8 at 3. O'Mara told Norfleet she wished to press charges against Stroud and that Norfleet "strongly discouraged [her] from doing so and told [her] that it would look bad on [her] as an officer if [she] were to file a complaint." ECF No. 34, attach. 2 at 6.

O'Mara filed charges against Stroud that resulted in Officer Blake of the Suffolk Police filing a Criminal Complaint with the General District Court. *Id.*, attach. 6 at 2. O'Mara told Officer Blake that Stroud stated:

> I Google you and fin [sic] out everything about you- where you live, where you go, what stores you go to. I know you're married I can find out your husband's name, if you have kids. You know who I am and the people I deal with, you what I can do. So do I still have to take a drug test?"

*Id.* O'Mara discussed the Stroud situation twice with Chief Knight, on March 10 and again on March 11. ECF No. 34, attach. 2 at 10. At the first meeting O'Mara brought her credentials with her "because [she] assumed [she] was being fired for filing charges." *Id.*

Who actually made the decision to terminate Plaintiff and when that decision was made is disputed. That same day, Deputy Chief Norfleet contacted Human Resources Manager Jones "to get guidance on reviewing [O'Mara's] probationary period." *Id.*, attach. 16 at 24. Norfleet said that she was working on a "needs improvement substandard performance" for O'Mara. *Id.* Norfleet stated she "did not have in [her] mind that [she] wanted to end [O'Mara's] probationary period" but expressed "concerns of credibility, liability, and trustworthiness" to Jones. *Id.* at 41, 43. At some point, "Ms. Jones deemed that it was appropriate to end [O'Mara's] probationary period." *Id.* at 43. When Norfleet was asked about her personal notes from this time period, she

said that as of March 10, 2016, they "still hadn't got to the point where [they] were considering ending her probationary period, that Grant [Knight] indicated that it was probably best that she no longer be the gang PO." *Id.* at 35.

On March 11, 2016, Chief Knight came into O'Mara's office "regarding a separate matter" and she asked if they could speak about yesterday's meeting. *Id.*, attach. 2 at 9. O'Mara said that Knight agreed and shut the door to her office and she told him "she was uncomfortable with the way the meeting had gone" because "[at] no time did anyone ask if [she] feared for [her] safety or if [she] needed anything from the department." *Id.* at 9-10. Then O'Mara stated Knight apologized and "said he was usually very good at that 'human piece' of things." *Id.* at 10. Further, O'Mara told Knight she "assumed [she] was being fired for filing charges" and asked Knight "how much trouble [she] was in, if [she] was in danger of being fired. [Knight] somewhat laughed at this and said he did not think so." *Id.* O'Mara said that Knight "reached his hand across the desk and placed it over [her] hand" and "was rubbing [her] hand with his thumb." *Id.*; *see also, id.*, attach. 15 at 28-31. According to O'Mara, Knight "stated that [O'Mara] was a very special officer and he went through a lot of trouble to find [her] and get [her] hired on and he did not want to lose [her]." *Id.*, attach. 2 at 10. O'Mara said Knight told her "I hope we can work something out to keep you here" and "repeated [she] was a special officer and a very pretty woman." *Id.* O'Mara also stated Knight told her "you're very special, and I have special feelings for you." *Id.* Following Knight's comments, O'Mara said she removed her hand and said "I'm married. And so are you. And those feelings are not mutual." *Id.* at 11; *see also id.*, attach. 15 at 28. O'Mara stated that Knight again told her she was not in danger of being fired, but that her filing charges "didn't look good" and that he hoped they could "work something out" to keep her. *Id.*, attach. 2 at 11. During their conversation, O'Mara

admitted Knight never said the words "sex," "sexual affair," or "sexual relationship." *Id.*, attach. 15 at 29-30. O'Mara told her husband about the incident over the next five days. *Id.* at 30-31. In O'Mara's answers to interrogatories, she said that only the incident on March 11 contained, in her opinion, "an implied threat of discipline." *Id.*, attach. 2 at 11.

O'Mara worked four hours on March 11, 2016, and "took the balance of the day as 'sick.'" *Id.*, attach. 11 at 1. O'Mara "took pre-arranged Family/Personal leave each working day until she returned on March 17, 2016." *Id.* When she returned on March 17, 2016, she received a termination of probation letter signed by Chief Knight, Deputy Chief Norfleet, and Deputy Chief Franklin. *Id.*, attach. 3. The letter stated that "[c]redibility and trust are the foundation to all Probation and Parole Officers. Your actions have provided cracks in that foundation that cannot be repaired." *Id.* Also issued on March 17 was a "Probationary Progress Review" authored by Deputy Chief Norfleet, which concluded that O'Mara's performance "shows deficiencies which interfere with the attainment of performance expectations." *Id.*, attach 5 at 2. The Progress Review specifically cited three instances of alleged misconduct: 1) O'Mara's contact with Soriano and arrangement of a meeting with Suffolk Police without approval of supervisors; 2) O'Mara's March 9 home visit to probationer Stroud's residence without being accompanied by her Field Training Officer; 3) Stroud's use of profanity, i.e. the word "bullshit," to Stroud during their office confrontation on March 10, and subsequent denials of doing so until finally stating that "she could not recall" if she did. *Id.* at 1-2.

In his deposition Knight testified that the decision to terminate O'Mara was made on March 11[1] and identified the persons involved in that decision: "Ms. Norfleet, Angie Jones from human resources offices with my endorsement on their recommendation to let her go." *Id.*,

---

[1] Knight testified that the decision to terminate "could have been" made on Monday, March 14, but he 'believed" it was made on March 11. ECF No. 34, attach. 17 at 10.

attach. 17 at 8-9. He testified that he, Deputy Chief Norfleet and Jones had the discussion to let O'Mara go on March 11, a decision they recommended and he endorsed. *Id.* Knight testified that he did not know when the Probationary Progress Review was drafted by Deputy Chief Norfleet, but that it was presented to O'Mara on March 17. *Id.* at 6-7. Knight testified that "Ms. Norfleet talked with Ms. Jones in the creation of this document" and after he received it and discussed it with Norfleet he "also called Ms. Jones." *Id.* at 9-10.

Jones testified that she spoke with Deputy Chief Norfleet about O'Mara as early as March 2 regarding "the gang situation," and then "a little bit after that" when Norfleet called her about the "altercation" in the office with Stroud. *Id.*, attach. 20 at 6-7. Jones testified that, based on O'Mara's visit to Stroud's home and "the outburst in the office," she "suggested" that O'Mara be separated from employment. *Id.* at 7-8. Jones specifically denied directing that O'Mara be terminated:

> Q: Did you direct that Ms. O'Mara be separated from employment?
> A: I did not direct. I suggest. It is up to the chief to actually make the final decision. The managers make the final decision. As an HR professional, I advise to ensure that final decision is according to HR policies and procedures.
> Q: So it was ultimately Mr. Knight's call?
> A: Yes.

*Id.* at 8. Jones' conversation with Knight about O'Mara occurred "about two days" before O'Mara was terminated, when Knight "asked [her] was it okay." *Id.* at 3.

In an email to Jones on March 14, 2016, Norfleet referenced O'Mara's "pending termination." ECF No. 40, attach. 10. Norfleet testified that she was ordered to end O'Mara's probationary period:

> Q: My question, though, was not were you concerned. Did you want Ms. [O'Mara's] probation to end on March 17th?
> A: I don't know how to answer that. I mean, I was – I was directed to do – I was directed to cut – to end it. So, I mean –

ECF No. 34, attach. 16 at 51. Norfleet also testified that as of March 11, 2016, Knight, Jones, and Norfleet "had not gotten the point where [they] were ready to fire" O'Mara. *Id.* at 35. Additionally, Norfleet testified regarding Knight's involvement in O'Mara's termination that she "would not have acted on [her] own on anything" and Knight "would have known everything that had—would have transpired." *Id.* at 49-50.

## B. Plaintiff's Motion to Strike and the Disclosure of Additional Evidence

On March 30, 2017, O'Mara filed the present Motion to Strike Motion for Summary Judgment, or for other relief as appropriate, and an accompanying memorandum. ECF Nos. 40-41. O'Mara stated that she served VDOC with a request for production on or about December 2, 2016 for "All documents that relate or pertain to any write-ups, complaints, comments, criticisms or warning, oral or written, concerning Plaintiff's employment with the Defendant." *Id.* at 2. VDOC responded "on or about January 9 and 10, 2017," that the March 17 Probationary Progress Review by Norfleet, the February 4 email from Baker to Norfleet, the email from Norfleet to Jones regarding February 4, and the letter of termination, satisfied Plaintiff's request. *Id.* at 2-3. On March 20, 2017, five days after Defendant filed its Reply to its summary judgment motion, "Defendant, through a contractor, first made available to Plaintiff its ESI production via an available download from the internet." *Id.* at 4. Included in the ESI production was an Incident Report from Chief Knight regarding O'Mara's March 10 confrontation in the office with Stroud. *Id.* O'Mara suggested this incident report was deliberately withheld from Plaintiff before the summary judgment briefing was concluded, and was only produced belatedly amongst thousands of other pages of mostly irrelevant documents. *Id.* The report was generated at 6:23

pm on March 11, 2016[2] and concluded: "[t]his office have [sic] been in ongoing contact with DOC HR on the conduct of this new officer. At this point have been advised that we need to terminate this new probationary employee." *Id.* O'Mara argued that "the Incident Report plainly contradicts VDOC's claim that "Mr. Knight did not know of the termination on March 11, 2016."[3] ECF No. 41 at 6. O'Mara contended:

> The incident report demonstrates that he either knew that a recommendation to terminate had been made as of his encounter with Plaintiff, and he was essentially offering her a way to save her job by accepting his implicit sexual proposition, or that the decision to terminate was made later on the same date that Ms. O'Mara rejected Mr. Knight's implicit sexual proposition. If the former is true, then it is plain that Defendant terminated Plaintiff for refusal to accept Mr. Knight's sexual overture. If the latter is true, then the determination of who actually made the call to terminate on March 11, 2016 becomes material. Regardless, these are issues of material fact not appropriate for summary judgment.

*Id.* Moreover, O'Mara claimed that Jones did not recommend Knight terminate O'Mara prior to March 11, 2016. *Id.* at 6-7. According to Jones' deposition, she did not discuss terminating O'Mara with Knight until "[a]bout two days before she was removed", or approximately March 15, 2016. ECF No. 40, attach. 11 at 3. O'Mara said this was consistent with the email Norfleet sent to Jones on March 14, 2016, and Norfleet's testimony and notes, so that "[a]t the least it is a genuine issue of material fact as to when and by whom the actual termination decision was made." ECF No. 41 at 7-8.

VDOC's response included second affidavits from Knight and Norfleet, along with an affidavit from an IT specialist explaining how the ESI material was obtained and produced. ECF

---

[2] When the report was actually written is not altogether clear. The report itself says it was generated as noted. However, in his declaration submitted in opposition to the motion to strike, Knight averred that the report was prepared on March 10, 2016. ECF No. 42, attach 7 at 2.

[3] The parties' arguments here are, frankly, confusing. VDOC represented in its statement of undisputed facts that "On March 11, Knight did not know, or claim to know, that O'Mara was about to be fired," citing Plaintiff's answers to interrogatories. ECF No. 34 at 9. However, the interrogatory answer cited does not make this representation. *Id.*, attach 2 at 10. Moreover, Knight testified that he "believed" the decision to terminate O'Mara was made on March 11. And, of course, Plaintiff argues the decision to terminate was made on March 11 when O'Mara reportedly rebuffed Knight's sexual advances.

No. 42, attachs. 7-9. VDOC argued that it did not have a hard copy of the Incident Report at the time it initially produced documents, and that production of ESI occurred as timely as possible and in accordance with the parties' agreement. *Id.* at 2-4. VDOC further argued that O'Mara could have asked for additional time to respond to its summary judgment motion until after ESI production. *Id.* at 4. Additionally, VDOC claimed the report is not material to resolving summary judgment because "Knight did not deny knowledge of the impending termination when he met with O'Mara in the critical conference" as he said "[t]he decision to terminate was **not final** at the time [he] completed Incident Report P06-0002 on March 10, 2016." *Id.* at 5 (emphasis in original). Because "[n]o subterfuge was involved", and "[t]he existence of the document was unknown to counsel for Defendants, to the representatives of VDOC assisting counsel, to anyone deposed beyond the draftsman, Knight", *id.* at 6, VDOC claimed striking its motion would be inappropriate as (1) "If the Defendant, through Knight, knew of a pending discontinuance of O'Mara's employment on March 10, it is no more probable that the reason for her termination was gender discrimination"; (2) "The Incident Report, likewise, has no bearing on the question of whether a *Bowman* wrongful discharge can be grounded in allegations of adultery"; and (3) the Incident Report does not change that O'Mara failed to provide evidence showing she was terminated for rebuffing Knight for her *quid pro quo* harassment or retaliation claims, *id.* at 7.

In O'Mara's Reply she contended that Knight's statement in his second Declaration that their "decision [to terminate O'Mara] was not final when [he] met with O'Mara the next day, March 11, 2016" because "[t]here was still an opportunity, at that time, to discuss options with O'Mara", evidenced a "triable question of fact" as to what options were discussed and how the decision to fire O'Mara was reached because "no written evidence exists of any dissatisfaction

14

with O'Mara prior to March 11, 2017" besides Norfleet's testimony. ECF No. 45 at 1-2. Additionally, O'Mara argued the second Norfleet declaration which VDOC submitted in response to the motion to strike contradicted Norfleet's previous sworn testimony and handwritten notes reflecting "that she knew of no decision regarding Plaintiff's termination as of March 11, 2016." *Id.* at 3. Norfleet averred in her second declaration that she and Jones "recommended O'Mara's termination to Grant Knight, as Chief, who approved our recommendation on or after March 11." *Id.* at 3 (citing ECF No. 42, attach. 8 at 2). Such contradiction, O'Mara argued, raised a genuine issue of material fact as to when the decision to terminate Plaintiff was made, and who actually made it. *Id.*

## III. ANALYSIS

### A. Sexual Harassment Claim

To prevail on her claim of *quid pro quo* harassment, O'Mara must first prove her *prima facie* case that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual conduct; (3) the conduct was because of her sex; (4) her reaction to the harassment affected tangible aspects of her employment; and (5) her employer knew or should have known of the harassment but did not act. *See, Okoli v. City of Baltimore*, 648 F.3d 216, 222 (4th Cir. 2011). If O'Mara can prove her *prima facie* case, the burden of production "shifts to [VDOC] to articulate some legitimate, nondiscriminatory reason" for the tangible aspect of her employment. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000) (citation omitted). If VDOC can do so, O'Mara must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation omitted).

In the instant matter, VDOC apparently conceded that O'Mara met prongs 1, 2, and 5 at the summary judgment stage, as it only argued that O'Mara is unable to meet prongs 3 and 4. Therefore, VDOC does not challenge by its motion that O'Mara belongs to a protected group because of her sex and that she may be considered to have been subject to unwelcome conduct when Chief Knight rubbed her hand on March 11, 2016 and told her he hoped "something could be worked out" to keep her job. Prong 5 is also not challenged because the alleged harassment involved Chief Knight, O'Mara's ultimate supervisor, and the Supreme Court has found that employers knew or should have known of harassment when the alleged harassment involves their supervisors. *Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Regarding prong 3, VDOC argued that "O'Mara does not show that Knight's touch of her, on March 11, 2016, is anything other than a touch out of concern for her after the Stroud altercation and the police intervention" and that using the objective standard required, "[h]is touch was not plainly inappropriate, or objectively sexual, but instead consistent with a caring supervisor." ECF No. 34 at 11-12. In *Briggs v. Waters*, the plaintiff, a deputy sheriff for the City of Portsmouth, brought a claim for *quid pro quo* sexual harassment against the sheriff and the sheriff's office alleging she was terminated after rebuffing the sheriff's sexual advances. *Briggs v. Waters*, 484 F.Supp.2d 466, 468-70 (E.D. Va. 2007). This Court in denying the defendant's motion for summary judgment said that "to establish the existence of a sexual advance, a plaintiff need not show that an explicit request for sex was made." *Id.* at 478. The Court stated that whether a person's actions were a proposition for sex is an issue of fact to be determined by the jury, and that the plaintiff demonstrated she had been subject to unwelcome sexual conduct because the sheriff asked if she was single, made comments "regarding the attractiveness of certain physical attributes", "made unnecessary physical contact with [her] by

hugging her and, on one occasion, patting her leg", and invited her to go to Atlantic City with him. *Id.* at 478-79.

Here, under the standard enunciated in *Briggs*, Chief Knight's actions cannot be said objectively to not constitute a sexual proposition as a matter of law. In other words, those actions, when viewed in the light most favorable to Plaintiff, might reasonably be considered by a jury to constitute an implied proposition for sex in exchange for not terminating Plaintiff's employment. Although Knight did not use the words sex, sexual affair, or sexual relationship, it is undisputed that he "reached his hand across the desk and placed it over [her] hand" and "was rubbing [her] hand with his thumb" while telling her he hoped he could "work something out" to keep her there. ECF No. 34, attach. 2 at 10; *id.*, attach. 15 at 28-31. He told her twice she was "a very special officer," that she was "a very pretty woman," and that "you're very special, I have special feelings for you." *Id.*, attach. 2 at 10. These facts are sufficient at the summary judgment stage to create a genuine dispute of the material fact as to whether Knight's advance was a *quid pro quo* offer for O'Mara to participate in a sexual relationship with Knight in exchange for her keeping her job. This is especially so when viewed in the context of Knight's prior alleged comments and actions, when he purportedly: told O'Mara on other instances that she was an "attractive female", *id.*, attach. 2 at 4; told O'Mara that she should stop wearing pants that were tight because "he was distracted by how good [she] looked", *id.*, attach. 15 at 23; raised with O'Mara the subject of the failure of his own wife to perform her "wifely duties" because of her Crohn's disease, and then inquired of O'Mara if she were also similarly hindered, *id.* at 25-26; and inappropriately touched O'Mara's buttocks, ECF No. 36, attach. 9 at 5-6. Looking at the totality of the circumstances surrounding the March 11 interaction in the light most favorable to O'Mara, a genuine issue of material fact exists as to prong 3.

VDOC argued O'Mara cannot demonstrate prong 4 because she "cannot say that her resistance to sexual overtures *affected* her termination because she cannot show influence or pressure from a rebuked Knight upon Jones or upon Norfleet" and she cannot "deny that before March 11, 2016, the two women were in discussions about her termination from employment." ECF No. 34 at 12 (emphasis in original). Prong 4 also requires that O'Mara establish material facts showing she was entitled to the job benefit that she did not receive because of the adverse action. *Okoli*, 648 F.3d at 222. VDOC argued that O'Mara was not entitled to continue her probationary period because of her failure to inform her supervisors on February 29, 2016 of the Suffolk Police Department meeting, her conduct at the home visit on March 9, and the incident with Stroud at her office on March 10. ECF No. 34 at 12. VDOC also stated that "[t]hese same factors constitute a legitimate business reason to discontinue the probationary employment of O'Mara." *Id.* O'Mara responded that the reasons given for her termination are mere pretext. ECF No. 36 at 20-25.

First, there is a material dispute regarding the timeline of the decision to terminate O'Mara. Although Norfleet said in her deposition that she discussed terminating O'Mara with Jones on March 10, ECF No. 34, attach. 16 at 41, 43, she also said during that same deposition that on March 10 they "hadn't got to the point where [they] were considering ending her probationary period", *id.* at 35, and that even on March 11 they "had not gotten to the point where [they] were ready to fire" O'Mara, *id.* Norfleet stated in her most recent Declaration that she and Jones "recommended O'Mara's termination to Grant Knight, as Chief, who approved [their] recommendation on or after March 11." ECF No. 42, attach. 8 at 2. Jones testified in her deposition said she did not discuss terminating O'Mara with Knight until "[a]bout two days before she was removed", or approximately March 15, 2016, ECF No. 40, attach. 11 at 3.

18

Knight testified in his deposition that Jones and Norfleet recommended that O'Mara be terminated, which he then endorsed, and that this decision was made on March 11, ECF No. 34, attach. 17 at 8-9. Norfleet's email to Jones references O'Mara's pending termination, and was sent on March 14. ECF No. 40, attach. 10. The newly submitted Incident Report only further creates a material dispute as it seems to demonstrate that Knight knew O'Mara was to be terminated before their meeting on March 11. *Id.*, attach. 9 at 2-3. Given the contradictory statements between Norfleet, Jones, and Knight as to when the decision to terminate was made, VDOC's argument that O'Mara's termination was totally unconnected to the March 11 incident between Knight and O'Mara is unpersuasive. A genuine issue of fact is in dispute on this matter, and this fact is material because it suggests Knight, who the VDOC witnesses agree was the authorized decision-maker, could have made this decision as early as March 11, contingent upon whether O'Mara agreed to his sexual advance.

In addition, there also exists a genuine issue of fact as to whether Knight merely accepted the termination recommendation of Norfleet and Jones or was the driving force behind the decision. This fact is material because, if Knight merely acquiesced in the recommendation of others, it becomes less reasonable to conclude that O'Mara's reaction to the proposition—rebuffing Knight's advances—affected a tangible aspect of her employment. In other words, if Norfleet and Jones were determined that O'Mara should be terminated, then Knight's conduct arguably may not have affected that result. But, these facts are disputed because, first, Jones clearly averred that she did not talk to Knight about O'Mara until two days before O'Mara's termination, and that she only "suggested" that course of conduct based solely on what Knight and Norfleet relayed to her. Second, Norfleet testified that neither she nor Jones had considered terminating O'Mara's probationary period of employment on March 11, and her first reference to

such action is evidenced by a March 14 email she sent to Jones.[4] Norfleet further testified that she could not make any such decisions without Knight's approval, and that she would not have acted on her own on anything. Only Knight claims the termination decision was made on March 11, although his declaration avers that the incident report he prepared referencing the need to terminate O'Mara, though dated March 11, was actually written on March 10. Hence, if he knew first that he was going to terminate O'Mara, it becomes reasonable for a jury to conclude that her rejection of his sexual advance on March 11 affected her termination. Just like the case in *Briggs*, where the plaintiff "was placed on administrative leave less than three months after she rejected Waters's trip invitation", O'Mara's case is one of "implicit conditioning" where "causation 'can be inferred only from the particular facts and circumstances of the case'" and "one way to establish the requisite nexus is to show that 'the unwelcome sexual advances proximately preceded the tangible employment action and the alleged harasser made or substantially influenced the relevant decision.'" 484 F.Supp.2d at 479-81 (citations omitted). In this case, Chief Knight met with O'Mara on March 11, and she was terminated from work the next time she came in for work. Chief Knight was the person who ultimately made the decision, so there are enough facts for a jury to find O'Mara's actions affected her termination.

Furthermore, sufficient facts have been proffered at this stage for a reasonable jury to find that the three reasons VDOC gave for terminating O'Mara are merely pretext. If "[t]he determination of what actually happened depends on an assessment of the credibility of the

---

[4] Norfleet's second declaration as to when the final decision to terminate O'Mara was made appears to squarely contradict her deposition testimony. *Compare* ECF No. 42, attach. 8 at 2 ("Our decision [to terminate O'Mara] was not final until the next day, March 11, 2016) *with* ECF No. 34, attach. 16 at 35 ("Q: On 3/11, you had not gotten to the point where you were ready to fire her, is that what you just said? A: We had not gotten to that point."). The Supreme Court has held that, under the sham affidavit doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment by contradicting his or her own sworn previous statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition testimony) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). Similarly, a party cannot attempt to remove a genuine issue of material fact by the same tactic.

respective witnesses" then "[t]his assessment is a disputed issue of fact and, therefore, cannot be resolved on summary judgment." *Rainey v. Conerly*, 973 F.2d 321, 324 (4th Cir. 1992). VDOC argued that one reason O'Mara was terminated was for "failure to inform her superiors of the arrival and meeting with the Suffolk Police on February 29, 2016." ECF No. 34 at 12. O'Mara was already sanctioned for this conduct though, when Deputy Chief Norfleet issued a "Notice of Improvement" to O'Mara on March 10, 2016. *Id.*, attach. 8. The second reason offered for O'Mara's termination was her "conduct of the home visit on March 9, 2016 which exceeded permitted scope." ECF No. 34 at 12. However, what exactly O'Mara did wrong is disputed. Knight testified that O'Mara violated policy by going into the Stroud's house accompanied only by a surveillance officer. *Id.*, attach. 17 at 14-15. However, Norfleet admitted to specifically authorizing O'Mara to conduct this home visit with surveillance officer Yarborough. *Id.*, attach. 16 at 25-26. Norfleet further testified that, although she authorized O'Mara to go on the visit with Yarborough, she did not authorize her to go through Stroud's closet and dresser drawers. *Id.*. However, Yarborough testified in her deposition that O'Mara did not go through Stroud's closet or dresser. ECF No. 36, attach. 7 at 3-4. Thus, given these disputed facts, a reasonable jury could find that this reason for termination was pretext. Finally, VDOC claimed O'Mara was terminated for her involvement in an "office altercation and unprofessional conflict on March 10, 2016, involving Stroud." ECF No. 34 at 12. However, it is not disputed that Stroud threatened O'Mara and created the confrontation. Furthermore, VDOC presented no evidence to support the claim that O'Mara used profane language, other than the fact that O'Mara said to Norfleet she told Stroud to "get his shit together" once when summarizing the event to Norfleet. *Id.*, attach. 2 at 5. Not only does O'Mara deny saying that word to Stroud, but PPO Boone, who was present at the time, testified that he had no recollection of O'Mara using profane language. ECF

No. 36, attach. 8 at 3. Therefore, a reasonable jury could find that VDOC's unsupported claim that O'Mara used profane language was pretext.

Genuine issues of material fact exist as to whether Knight engaged in *quid pro quo* sexual harassment, and whether O'Mara's rejection of Knight's sexual advances resulted in her termination from employment by Knight, including whether the reasons proffered by VDOC for that termination were merely pretext. Accordingly, the undersigned **RECOMMENDS** that VDOC's summary judgment motion be **DENIED** with respect to the sexual harassment claim.

### B. Retaliation Claim

In order to prevail on her retaliation claim, O'Mara must show she (1) engaged in protected activity; (2) that resulted in VDOC taking a materially adverse employment action against her; and (3) there is a causal connection between the protected activity and the adverse employment action. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). Like with O'Mara's sexual harassment claim, if O'Mara can make her *prima facie* case, the burden shifts to VDOC to produce a legitimate, nondiscriminatory reason, and if it can do that, O'Mara must show the reason is mere pretext. *Id.* at 650-51.

VDOC argued that its reasons for terminating O'Mara regarding the sexual harassment claim also demonstrate that she cannot prove a causal connection of her termination, and that VDOC had a legitimate nondiscriminatory reason to terminate her. ECF No. 34 at 13-15. O'Mara responded that VDOC's "pretextual reasons for termination is all the more glaring when viewed in light of the extraordinary close temporal proximity between Plaintiff's refusal to accept Mr. Knight's implied proposition and the adverse employment action–her termination." ECF No. 36 at 26. As discussed in connection with O'Mara's sexual harassment claim in Sec. III.A, *supra*, there are material disputes of fact regarding VDOC's proffered reasons for

termination. Here, a reasonable jury could find a causal connection between O'Mara's rebuffing Knight and her termination, and could reasonably conclude that the reasons VDOC gave for terminating O'Mara were pretext. Therefore, the undersigned **RECOMMENDS** that VDOC's motion for summary judgment be **DENIED** with respect to the retaliation claim.

## C. Gender Discrimination Claim

To prevail under her Title VII gender discrimination claim, O'Mara must demonstrate that she (1) is a member of a protected class; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated differently. *Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 626 (4th Cir. 2015). Like with claims for sexual harassment and retaliation, if she can meet her *prima facie* case, the burden shifts to VDOC to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Lettieri*, 478 F.3d at 646. If VDOC meets its burden of production, O'Mara can offer evidence that VDOC's reasons are mere pretext. *Id.*

Here, VDOC claimed that O'Mara cannot meet prong 2 of her *prima facie* case because she did not perform her job satisfactorily and "[a]s discussed above" she "was not performing her duties as a Probation Officer to the expectations or satisfaction of her supervisors, Norfleet or Knight." ECF No. 34 at 16. As mentioned with regards to the sexual harassment and retaliation claims, Secs. III. A-B, *supra*, there are material disputes of fact regarding whether the conduct for which VDOC claims O'Mara was disciplined constituted a failure to satisfy her supervisors' expectations. Regarding the Stroud home visit March 9, disputed evidence would permit a reasonable jury to conclude that, since Norfleet authorized the home visit and Yarborough confirmed nothing untoward happened during it, VDOC had no basis to conclude this conduct constituted unsatisfactory job performance. Similarly, regarding the confrontation with Stroud

the following day, disputed evidence would permit a reasonable jury to conclude that, since Stroud specifically threatened O'Mara and instigated the confrontation, and O'Mara denied using profanity and VDOC's only witness to the confrontation, Boone, confirmed O'Mara did not use profanity, VDOC had no basis to conclude that O'Mara's conduct constituted unsatisfactory job performance. Finally, regarding O'Mara's consultation with Soriano and scheduling a meeting with the Suffolk Police Department without authorization, Norfleet did issue a Notice of Improvement in response to these events and implemented an improvement plan to improve O'Mara's performance. ECF No. 34, attach. 8. Hence, a reasonable jury could conclude that this particular job performance issue sufficiently and appropriately was addressed by means of the Notice of Improvement, and any further sanction did not legitimately reflect appropriate consequences for unsatisfactory job performance. Consequently, a reasonable jury could conclude that O'Mara was performing her job satisfactorily and was meeting her employer's legitimate expectations, but that VDOC relied on these instances as a pretext for discrimination.

Additionally, VDOC argued that O'Mara could not meet prong 4 because her "case is devoid of evidence of disparate treatment between female and male Probation Officers working under similar circumstances." ECF No. 34 at 16. VDOC noted two areas where O'Mara claimed gender differences came into play: purported comments Knight and Norfleet made to O'Mara about her attire, and the criticism of her as a small woman going into the homes of offenders where male PPO's were not so restricted. *Id.* VDOC describe the attire criticisms as "mild," and argued that "[a]ttire goes unmentioned in the report justifying discontinuance of her probationary period." *Id.* Also, VDOC argued that although O'Mara was prohibited from making home visits when male PPOs were not, she was disciplined because she was on probationary status and had not received adequate training, and not because she was a woman.

*Id.* at 16-17. O'Mara responded that her attire was appropriate, and that she was singled out and embarrassed "for wearing normal work pants" when male co-workers were not. ECF No. 36 at 26-27. Moreover, she argued that Knight's comments regarding her legs being "a distraction" to him in connection with criticizing her attire was not the type of comment made to male PPOs. *Id.* at 27. O'Mara further argued that VDOC failed to identify any policy or protocol that would have restricted O'Mara, described by Norfleet and Knight as "small and female" and by Knight as "attractive," from participating in home visits the way male PPOs were not so restricted. *Id.*

Regardless of whether comments regarding O'Mara's attire constituted disparate treatment, disputed material facts surround the reason why O'Mara was reprimanded and instructed not to conduct home visits when male PPOs were permitted to do so. VDOC argued: "the fact that her supervisor, Norfleet, did receive a report of entry into Stroud's bedroom, and of opening and searching of Stroud's dresser drawers, justified the reprimand." ECF No. 34 at 16-17. In light of the fact that Norfleet authorized O'Mara to conduct the home visit, that no evidence was presented that O'Mara "open[ed] and search[ed] Stroud's dresser drawers," and instead both O'Mara and Yarborough denied that any such conduct occurred, a reasonable jury could conclude that it was Norfleet's and Knight's perception of O'Mara as "small" and "female" that justified precluding her from conducting home visits. Therefore, the undersigned **RECOMMENDS** that VDOC's motion for summary judgment be **DENIED** with respect to the gender discrimination claim.

### D. Wrongful Discharge in Violation of Virginia Public Policy Claim

Although Virginia is an employment-at-will state and employers can typically discharge employees without a reason, employers cannot terminate an employee for a reason that violates established public policy. *Bowman v. State of Bank of Keysville*, 331 S.E.2d 797, 801 (Va.

1985). O'Mara initially argued that VDOC violated public policy by terminating her for (1) her refusal to perjure herself when she was asked to sign the statement of her altercation with Stroud at the office and (2) her refusal to commit adultery with Chief Knight in violation of Virginia Code § 18.2-365. ECF No. 1 at ¶¶ 49-58. In her response to VDOC's summary judgment motion, O'Mara withdrew her claim under the perjury statute, but still argued that her *Bowman* claim under Virginia's adultery statute should survive summary judgment. ECF No. 36 at 28.

VDOC proffered three reasons why O'Mara's claim should not survive summary judgment. First, VDOC claimed that a plaintiff cannot prevail on a *Bowman* claim involving Virginia's adultery statute because the Supreme Court of Virginia has previously held that Virginia Code § 18.2-344 criminalizing sex between two unmarried persons was unconstitutional after the Supreme Court of the United States' decision in *Lawrence v. Texas*, 539 U.S. 558 (2003). ECF No. 34 at 21-23 (citing *Martin v. Ziherl*, 607 S.E.2d 367 (Va. 2005)). The Supreme Court of Virginia addressed *Martin* recently in a case where a Salvation Army employee alleged she was terminated after refusing to engage in fornication with her store manager. *Robinson v. Salvation Army*, 791 S.E.2d 577, 578 (Va. 2016). "In its motion for summary judgment, the Salvation Army asserted Robinson could not prove she was fired for refusing to commit a violation of Code § 18.2–344 because the Court ruled that statute was unconstitutional in *Martin v. Ziherl*, 269 Va. 35, 42–43, 607 S.E.2d 367, 370–71 (2005)." *Id.* at 579.

The Supreme Court of Virginia affirmed the trial court's decision granting summary judgment and held that Virginia Code § 18.2-344 could not be a basis for the employee's *Bowman* claim because the statute was unconstitutional. *Id.* at 580-81. However, the Supreme Court of Virginia distinguished this case from its previous decision in *VanBurren* where it stated that "there is no question" that a plaintiff can bring a "cognizable wrongful discharge claim

against her employer" for a "discharge resulted from her refusal to engage in the criminal act[] of adultery." *Id.* (quoting *VanBurren v. Grubb*, 733 S.E.2d 919, 922 (Va. 2012)). Thus, O'Mara can still bring the instant *Bowman* claim under Virginia Code § 18.2-365 as it has not been ruled unconstitutional by the Supreme Court of Virginia at this time.

Secondly, VDOC argued that O'Mara is not specifically protected under the adultery statute because O'Mara cannot be prosecuted for violating the statute in Virginia and the statute was aimed to protect her husband. ECF No. 34 at 23-25. Virginia Code § 18.2-365 provides that "[a]ny person, being married, who voluntarily shall have sexual intercourse with any person not his or her spouse shall be guilty of adultery, punishable as a Class 4 misdemeanor." Since the Supreme Court of Virginia has not found this statute to be unconstitutional, O'Mara could in fact be prosecuted under this statute, so O'Mara can bring a *Bowman* claim for wrongful discharge for a "discharge resulted from her refusal to engage in the criminal act[] of adultery." *VanBurren*, 733 S.E.2d at 922. Furthermore, although criminalizing adultery may protect spouses like O'Mara's husband, that fact is of no relevance, as terminating an employee for failing to commit a criminal act is precisely the violation of public policy that *Bowman* claims were intended to vindicate. *Robinson*, 791 S.E.2d at 580 (stating that "a valid criminal law could provide a basis for a cause of action based on public policy").

Third, VDOC contended that there is insufficient evidence to show Knight wanted O'Mara to engage in adultery, but only that he "simply want[ed] to offer her solace during a stressful time." ECF No. 34 at 26. VDOC argued that Knight never used words like "sex" or "sexual relations" when speaking with O'Mara, touching her hand "encompassed the entirety of what she saw as an implied threat of discipline", and she only reported the incident to her husband. *Id.* Nonetheless, these interpretations merely point to a dispute as to Knight's intent

when he stroked O'Mara's hand and made his comments—a material fact. Under the circumstances, there is a material dispute as to whether Knight wanted O'Mara to engage in adultery. O'Mara testified that, in response to what she perceived to be Knight's proposition, she removed her hand and said: "I'm married. And so are you. And those feelings are not mutual", ECF No. 34, attach. 2 at 10-11. Given Knight's purported contemporaneous statements that O'Mara was a special officer and a very pretty woman, and that he "hope[d] we can work something out to keep you here", and in light of his previous conduct towards her,[5] a jury could reasonably conclude that Knight was propositioning O'Mara to commit adultery. Consequently, all of VDOC's reasons for granting summary judgment on O'Mara's wrongful discharge claim are insufficient, and the undersigned **RECOMMENDS** that VDOC's motion for summary judgment be **DENIED** with respect to the wrongful discharge claim.

### E. Plaintiff's Motion to Strike

O'Mara has requested that VDOC be sanctioned for its late disclosure of ESI, particularly the incident report prepared by Knight. O'Mara argued that this information should have been disclosed well before the summary judgment briefing was concluded, and implied that VDOC intentionally acted in bad faith because it produced the incident report amidst 6,561 documents, most of which "do not bear any relevance to the subject matter of this litigation." ECF No. 41 at 4. O'Mara further argued that the incident report is crucial evidence showing Knight either

> knew that a recommendation to terminate had been made as of his encounter with Plaintiff, and he was essentially offering her a way to save her job by accepting his implicit sexual proposition, or that the decision to terminate was made later on that same date that Ms. O'Mara rejected Mr. Knight's implicit sexual proposition. If the former is true, then it is plain that Defendant terminated Plaintiff for refusal

---

[5] These actions included, for example, previous comments telling her she had "a very nice figure", was "a very pretty woman", that she had to stop wearing pants that were tight because "he was distracted by how good [she] looked in [her] pants;" asking her whether her Crohn's disease prevented her from fulfilling her intimate "wifely duties", *see* ECF No. 34, attach 2 at 9; and touching her buttocks inappropriately, ECF No. 36, attach. 9 at 5-6.

to accept Mr. Knight's sexual overture. If the latter is true, then the determination of who actually made the call to terminate on March 11, 2016 becomes material.

ECF No. 41 at 6.

VDOC's response included declarations from Chief Knight and Justin Barbour, VDOC's eDiscovery contractor. ECF No. 42, attachs. 7 and 9. Chief Knight averred that he did not keep a copy of the incident report and thus did not have it to produce in discovery. *Id.*, attach 7 at 3. He explained his failure to mention the report at his deposition: "As I processed 20 to 30 different documents and e-mails daily, in March 2016, it was not recalled by me at the time of my discovery deposition." *Id.* VDOC argued that all ESI was produced in due course following lengthy negotiation with Plaintiff's counsel, and that the incident report itself was not provided to VDOC's counsel until the ESI was produced. ECF No. 42 at 1-4, 6-7. VDOC further argued that the incident report is not material to the summary judgment issues in the case. *Id.* at 4-6.

"The Supreme Court has long recognized the Court's inherent authority to sanction discovery abuse such as a party's failure to comply with discovery requests. *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962). Additionally, "courts have relied on their inherent authority to impose sanctions for bad faith conduct during litigation." *White v. Office of the Public Defender for the State of Maryland, et al.*, 170 F.R.D. 138, 148 (D. Md. 1997). To balance due process rights of litigants and the integrity of the judicial process, the Court must consider the following factors before imposing sanctions of the type sought here: (1) "whether the noncomplying party acted in bad faith" (2) "the amount of prejudice his noncompliance caused his adversary" (3) "the need for deterrence of this particular sort of noncompliance" and (4) "the effectiveness of a less drastic sanction." *Mut. Fed. Sav. & Loan Ass'n v. Richard & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).

In the first instance, the incident report does appear to be relevant to the issues in this case, as it suggests Knight had determined to terminate O'Mara before any other VDOC actor voiced a similar opinion. As the Court noted *supra*, material facts are disputed as to when the decision was made to terminate O'Mara and which actor was the driving force behind this determination. Moreover, Chief Knight's justification that "it was not recalled by me" that he had prepared this report is somewhat dubious in light of the fact that O'Mara made her EEOC claim within two weeks of her termination, and therefore a report documenting the plan to terminate her would seem to have been a prominent piece of evidence to respond to her claims. Nonetheless, this situation alone is insufficient evidence of bad faith on the part of VDOC to warrant sanctions. No evidence suggests VDOC counsel was aware of this incident report prior to the production of ESI, or that VDOC intentionally failed to disclose it sooner. The parties negotiated the terms of ESI discovery over the course of many weeks, and Barbour explained the method and manner of production once appropriate search terms were agreed upon. ECF No. 42, attach. 9. Inasmuch as the agreed upon search terms resulted in the disclosure of more than 6,500 documents, it cannot be said that the production of these documents—even if many were irrelevant—was in any way improper. Consequently, the undersigned does not find that the failure to produce the incident report earlier in discovery was bad faith.

Additionally, the Court did consider the incident report in reaching its conclusion that material facts are in dispute, so O'Mara was not prejudiced by the fact that summary judgment briefing was concluded before the report was produced. While O'Mara did not have the opportunity to cross-examine Chief Knight about the report at his deposition, given Knight's contention that "it was not recalled by" him, it is doubtful any further information would be elicited from further deposition that would shed probative light on the issues in this case. And,

of course, since the undersigned is recommending that summary judgment be denied, striking

VDOC's motion would be moot in any event. Consequently, the undersigned **RECOMMENDS**

that Plaintiff's Motion to Strike Motion for Summary judgment be **DENIED**.

## IV. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Defendant's Motion for

Summary Judgment, ECF No. 33, be **DENIED**, and that Plaintiff's Motion to Strike Motion for

Summary Judgment, ECF No. 40, be **DENIED**.

## V. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific

written objections to the above findings and recommendations within fourteen days from the date

this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C)

and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil

Procedure Rule 6(a). A party may respond to another party's specific written objections within

fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72(b).

2. The Chief United States District Judge shall make a *de novo* determination of those

portions of this Report and Recommendation or specified findings or recommendations to which

objection is made. The parties are further notified that failure to file timely specific written

objections to the above findings and recommendations will result in a waiver of the right to

appeal from a judgment of this Court based on such findings and recommendations. *Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S.

1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
May 15, 2017